[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This controversy arises from an agreement to sell real estate that includes a restaurant business located on the property. Plaintiff Denise Raab ("Plaintiff" or "Ms. Raab") claims she has been unlawfully locked out of said property and Defendants Marilyn Bouchard ("Mrs. Bouchard") and Roger Bouchard ("Mr. Bouchard") (collectively referred to as "Defendants") assert that Plaintiff's failure to perform in accordance with their agreement justifies such action. This matter was tried before the Court without a jury and the Plaintiff and Defendant agree that two issues are before the court for decision — Plaintiff's request for injunctive relief and Plaintiff's request for a decree of specific performance. Defendants object to both requests.
The Court finds the following facts have been established by a preponderance of the credible evidence:
 1. Ms. Raab is an individual and a resident of Woonsocket, Rhode Island. Mrs. Bouchard is an individual, and is a resident of Woonsocket, Rhode Island. Mr. Bouchard is the husband of Mrs. Bouchard, and an individual and a resident of Woonsocket, Rhode Island.
 2. In the fall of 2002, Mrs. Bouchard opened a restaurant located on Arnold Street in Woonsocket, Rhode Island which became known as "Castle Garden Café," through the limited liability company Green Apron, LLC.
 3. In January of 2003, Ms. Raab began working at the restaurant in various capacities, all under Mrs. Bouchard's name and the parties began negotiating an agreement with regard to the transfer of ownership of the real estate and business from Mrs. Bouchard to Ms. Raab. Plaintiff's lawyer, Attorney Gordon Carpenter, drafted a letter outlining the agreed terms for the sale and purchase of Castle Gardens Café. It was agreed that the Defendants would sell and the Plaintiff would purchase said establishment, including all real estate, equipment, inventory and the like for the sum of One Hundred and Eighty Thousand Dollars ($180,000), to be paid in equal monthly installments, at five percent interest over the course of ten years. This letter was never signed by the Defendants and no other written documents were prepared by either party attempting to memorialize this agreement.
 4. Under the paragraph entitled "Payment Terms" in the draft agreement, Ms. Raab's monthly payments were to be paid pursuant to an amortization schedule. Pursuant to that schedule, Ms. Raab was to make monthly payments of One Thousand Dollars ($1,000) for the first year, One Thousand Five Hundred Dollars ($1,500) for the second year and One Thousand Seven Hundred and Seventy Five Dollars ($1,775) for the third year. The document went on to provide that payments under the agreement were to commence on the first business day of the second month following the effective date but not before July 1, 2003.
 5. Under the paragraph entitled "Insurance" in the draft agreement, Plaintiff was required to obtain a life insurance policy in the amount of One Hundred and Fifty Thousand Dollars ($150,000), identifying the Defendants as the beneficiaries.
 6. Within the draft agreement, there is a paragraph entitled "Transfer of Control of B-V License" which provides that "[i]n the event either (1) the Council denies the application for transfer of control; or (b) for whatever reason the Council does not act on the application on or prior to June 30, 2003, then without further act or deed this letter agreement shall terminate."
 7. The draft agreement does not comply with the State of Frauds because it is not signed by the party to be charged. However, because Defendant Marilyn Bouchard conceded to the essential terms of the agreement in her testimony before the Court, the Statute of Frauds is not a bar to enforcement of the agreement.
 8. In March of 2003, Ms. Raab took control over the everyday operation of the restaurant, including retention of its receipts. At that time, Ms. Raab also took possession of a four bay garage located on the same premises and converted the same to use as a residence. At that time, it was the agreement of the parties that all revenues of the business would pass to Ms. Raab and that all expenses of the business also transfer to Ms. Raab's name.
 9. The first payment received from the Plaintiff was in May of 2003 rather than the July 1, 2003 date set forth in the "Payment Terms" paragraph.
 10. The increase of the monthly payment from One Thousand Dollars ($1,000) per month for the first twelve months of the agreement to One Thousand Five Hundred Dollars ($1,500) per month for the second twelve months of the agreement never came to fruition. The Plaintiff indicated that she could not make the increased payment and continued to make payment at the lower rate of One Thousand Dollars ($1,000) per month after the first twelve months of the agreement. Defendants accepted these payments.
 11. Plaintiff obtained a life insurance policy which identified the Defendants as beneficiaries in the sum of One Hundred Seventeen Thousand Dollars ($117,000) rather than One Hundred Fifty Thousand Dollars ($150,000) as was called for in the writing. This insurance policy was in effect only for a period of three months, at which time the Plaintiff allowed the insurance policy to lapse.
 12. Plaintiff applied to the Woonsocket City Council for the transfer of Defendants' liquor license to the Plaintiff and that application was tabled indefinitely by the Woonsocket City Council. No further action was taken with regard to the license until Defendants asked that the license be renewed in their names. Plaintiff continued to serve alcoholic beverages at the restaurant pursuant to a liquor license in Defendants' names.
 13. On October 26 and 27, 2004, Mrs. Bouchard learned that some of the 2003-2004 real estate taxes on the property were unpaid and the personal property taxes for 2003-2004 were unpaid. She also learned that the beverage and meal tax was not paid, and the corporate taxes for 2003 and 2004 were not paid. Additionally, the water and sewer payments on the property were delinquent. Once Mrs. Bouchard learned of these things she sought out a lawyer to see what action she could take.
 14. In October of 2004, Mrs. Bouchard made the decision to close the restaurant effective November 1, 2004. Due notice of the same was sent to Ms. Raab at her last known address at 335-339 Arnold Street in Woonsocket, Rhode Island (the location of the restaurant). Ms. Raab was also sent a thirty day written notice of the termination of her residential tenancy in the former garage located on the premises. She took these actions believing the agreement was null and void due to Plaintiff's failure to comply with its terms.
 15. Between March of 2003 and October of 2004, Plaintiff made improvements to the restaurant and the four bay garage located on the restaurant's premises. These improvements have a value of $20,800.
 Discussion
In order to grant specific performance of a contract "the essential terms of the contract must be clear, definite, certain, and complete" before a court can properly award specific performance of a real estate contract. Caito v. Juarez, 795 A.2d 533, 536 (R.I. 2002) (quoting 71 Am.Jur. 2d Specific Performance § 34 (2001). "It must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties." St. Lawrence v. Reed, 74 R.I. 353, 357, 60 A.2d 734, 736
(1948) (quoting 49 Am.Jur. Specific Performance § 22 (1943)). Finally, the party seeking specific performance must demonstrate that he or she was "ready, able and willing to perform." Griffin v. Zapata, 570 A.2d 659,662 (R.I. 1990).
Plaintiff argues that she is entitled to specific performance of the property in question because there was a valid underlying contract between the parties and it is clear that both parties agreed to be bound. Moreover, Plaintiff contends that both parties remained bound to the agreement and Defendant waived any changes to the initial agreement by accepting Plaintiff's monthly payments for the property.
Conversely, Defendants contend that any agreement that may have existed between the parties terminated upon the Plaintiff's failure to abide by the terms of the agreement. It is Defendants' position that Plaintiff's payments to Defendants of One Thousand Dollars ($1,000) per month constituted a unilateral amendment of the payment terms of the agreement which placed Plaintiff in default of the agreement. Moreover, Defendants assert that the Plaintiff is in violation of the agreement because Plaintiff obtained an insurance policy of One Hundred and Seventeen Thousand Dollars ($117,000) rather than the One Hundred and Fifty Thousand Dollars ($150,000) as was called for in the writing between the parties and Plaintiff then permitted the policy to lapse after a period of only three months. Finally, Defendants contend that the Plaintiff's reliance on this agreement is misplaced in that the agreement was rendered null and void by the failure of the Woonsocket City Council to act on her application to transfer the liquor license held by the Defendants to the Plaintiff on or before June 30, 2003, as required by the paragraph of the writing entitled "Transfer of Control of B-V License."
The Rhode Island Supreme Court has held that equity does not require a court to enforce specific performance on an agreement if the terms of that agreement are not sufficiently definite and certain. St. Lawrencev. Reed, 74 R.I. at 357, 60 A.2d at 736. In St. Lawrence v. Reed, the Court quoted affirmatively from 49 Am. Jur., Specific Performance, § 22, which states as follows:
 "In order for a court of equity to decree specific performance of a contract, the court must be able to determine what must be done to constitute performance. The indefiniteness of an agreement is an adequate reason for refusal to direct specific performance thereof. The contract itself must make the precise act which is to be done clearly ascertainable. It is fundamental that in order to do this and to enable the court to decree specific performance, the terms of the contract must be clear, definite, certain, and complete. The contract must be free from doubt, vagueness, and ambiguity, so as to leave nothing to conjecture or to be supplied by the court. It must be sufficiently certain and definite in its terms to leave no reasonable doubt as to what the parties intended, and no reasonable doubt of the specific thing equity is called upon to have performed, and it must be sufficiently certain as to its terms so that the court may enforce it as actually made by the parties."
Additionally, our Supreme Court has repeatedly stated that proof of meeting of the minds is necessary to establish an express or implied contract. CentervilleBuilders v. Wynne, 683 A.2d 1340 (R.I. 1996); see alsoCrelin Technologies, Inc. v. Equipment Corp., 18 F.3d 1,7 (1st Cir. 1994); Antone v. Vickers, 610 A.2d 120, 123
(R.I. 1992); Mills v. Rhode Island Hospital, 828 A.2d 526
(R.I. 2003). In the present case, the evidence before this Court indicates that the parties had not reached a final agreement with regard to the purchase and sale of Castle Gardens Café at the time of the restaurant's closure. While Mrs. Bouchard conceded in her testimony before this Court that there was an oral agreement between the parties for the sale of the restaurant for the amount of One Hundred and Eighty Thousand Dollars ($180,000), the terms of that agreement are not sufficiently definite and certain to establish a contract for the sale property and it is apparent to this Court that there was no meeting of the minds on the precise terms of the agreement. The only written documentation before this Court regarding the sale of the restaurant is a draft agreement which was prepared by Attorney Gordon Carpenter but which was never executed by Defendants. Although the terms of the draft agreement set out specific terms for the sale of the restaurant, there is no additional documentation in this case demonstrating that the draft agreement ever became finalized.
Moreover, the inconsistencies between the draft agreement and the parties' actions in this case indicate that there was no meeting of the minds with respect to the specific terms governing the sale of Castle Gardens Café. The draft agreement refers to the effective date of the agreement as being the day after any and all appeals have run on the transfer of the Defendants' liquor license to the Plaintiff. The draft agreement also provides that payments under the agreement were to commence on the first business day of the second month following the effective date but not before July 1, 2003. Under that agreement Ms. Raab was to pay the One Hundred and Eighty Thousand Dollars ($180,000) in monthly installments, at 5% interest over the course of ten years. According to the payment terms in the draft agreement there would be monthly payments of one thousand dollars a month for the first twelve months of the agreement which would increase to One Thousand Five Hundred Dollars ($1,500) per month for the second twelve months of the agreement. Additionally, under the draft agreement the Plaintiff was required to obtain a life insurance policy identifying the Defendants as beneficiaries in the sum of One Hundred and Fifty Thousand Dollars ($150,000). However, the parties' actions during this time were completely inconsistent with the terms of the agreement. Despite the fact that the liquor license never transferred from the Defendants to the Plaintiff, the Plaintiff commenced payments pursuant to the amortization schedule in May of 2003, well before the July 1, 2003 date set forth in the draft document. Moreover, the Plaintiff requested an alteration to the amortization schedule decreasing monthly payments due from her to the Defendants for the second year of the schedule back to the first year rate, and the Defendants began accepting checks from the Plaintiff in such amounts. Furthermore, rather than obtaining a One Hundred and Fifty Thousand Dollar ($150,000) insurance policy as required in the draft agreement, the Plaintiff purchased an insurance policy in the amount of One Hundred and Seventeen Thousand Dollars ($117,000) which lapsed after only three months. Thus, it is clear to this Court that the only term of the draft agreement which was firm and consistent with the oral agreement of the parties was the purchase price of One Hundred and Eighty Thousand Dollars ($180,000). However, there is nothing in the record indicating that the Plaintiff is presently capable of paying One Hundred and Eighty Thousand Dollars ($180,000) for the restaurant and Plaintiff is now asking this Court to permit Plaintiff a reasonable time to recover from the burden of having her business shut down, in order to recommence fulfilling her part of the agreement. Accordingly, this Court must decide whether to grant specific performance of an agreement that has no definite and precise terms other than the purchase price.
In DePetrillo v. Lepore, No. 2004-122-A., slip op. at 1, (R.I., filed April 27, 2005), a recent case decided by our Supreme Court, the plaintiffs were seeking specific performance on a real estate contract which did not specify lot lines for the reserved parcel in question. Agreeing with the lower court that the terms pertaining to the division of land were indefinite, incomplete, and unclear, the Supreme Court held that the plaintiffs were not entitled to specific performance on the contract. Id. at 6. In its decision, the Court noted that one of the determining factors in reaching its conclusion was that there was a question as to what equitable relief the buyers were seeking. Id. The Court pointed out that the plaintiffs were essentially asking the court to "don [their] hard hats and survey instruments — or at least to supervise the parties in doing so — even before any conveyance [could] be ordered." Id. at 7. Similarly, in the present case the Plaintiff is asking this Court to fill in the terms of an agreement that is "indefinite, incomplete, and unclear" in order to suit the ever changing needs of the parties. It is clear to this Court that this is not the type of precise agreement that enables the Court to grant specific performance and that the parties' constant oral modifications to the draft agreement make it impossible for the Court to grant specific performance in this case.
Furthermore, even if this Court were to find that the parties' draft agreement was sufficiently definite, under the terms of that agreement the Plaintiff in this case committed a material breach. A material breach occurs when there is a breach of an essential feature of a contract, and must defeat the parties' object in making it. See generally, 17 Am. Jur. 2d, Contracts, § 706 (2d ed. 2004). Even if this Court accepts Plaintiff's argument that the Defendants waived the increase to One Thousand Five Hundred Dollars ($1,500) a month by accepting Plaintiff's checks of One Thousand Dollars ($1,000), it is apparent to this Court that the Defendants did not waive the requirement that Plaintiff obtain a One Hundred and Fifty Thousand Dollars ($150,000) life insurance policy. Not only did the Plaintiff purchase a policy that was significantly less than the specified amount but she also was grossly negligent in permitting the policy to lapse after only three months. Additionally, the agreement between the parties in this case was expressly contingent upon the Plaintiff's acquisition of Defendants' liquor license on or before June 30, 2003. The paragraph of the writing entitled "Transfer of Control of B-V License" provides, in part, that "[i]n the event . . . for whatever reason the Council does not act on the application [for transfer of control to the plaintiff] on or prior to June 30, 2003, then without further act or deed, this letter agreement shall terminate." Despite the express language in the agreement requiring that Plaintiff acquire a liquor license, the Plaintiff failed to take sufficient measures to transfer the liquor license by the deadline set forth in the parties' agreement. It is undisputed that, while the Plaintiff did apply for a transfer of the liquor license, that application was tabled indefinitely by the Woonsocket City Council and, from the date of its tabling, the Plaintiff made no further efforts whatsoever to bring the matter before the Council for action. It is well recognized that "[i]n the case of a bilateral contract in which the promised performances constitute an agreed exchange of equivalents, one who has himself broken his promise in some material respect cannot get a decree for specific performance." Corbin on Contracts Vol. 12 § 1175 (1964). This Court finds that Plaintiff's failure to obtain and maintain a One Hundred and Fifty Thousand Dollar ($150,000) insurance policy and her failure to acquire a liquor license by June 30, 2003 were material breaches that defeat Plaintiff's right to specific performance.
Moreover, this Court finds Plaintiff's position that her failure to acquire a liquor license does not affect her right to specific performance unavailing. Relying onThompson v. McCann, 762 A.2d 432 (R.I. 2000), Plaintiff claims that the condition of the agreement that she acquire a liquor license by June 30, 2003, was for the benefit of the Plaintiff, and therefore she had the right to waive that condition of the contract. While Plaintiff is correct that a party may waive a condition precedent if the condition is for the benefit of the waiving party, in the present case Plaintiff did not waive that condition because she continued to operate the restaurant as the Defendants had, offering and serving alcoholic beverages to the restaurant patrons pursuant to the Defendants' liquor license. Thus, the Defendants were left with the decision whether to let their license lapse or to renew their license in the event that the Plaintiff did not live up to her commitments and the Defendants had to sell the restaurant to another buyer. Additionally, in contrast to the parties in McCann, the Defendants in this case never led the Plaintiff to believe that the provision that Plaintiff had to acquire the liquor license by June 30, 2003 was waived. In reaching its decision, theMcCann Court pointed out that "the post-agreement conduct and statements of the parties indicated that, despite the `time is of the essence' clause, the May 27, 1998, closing date would not be treated as a strict deadline under the agreement." 762 A.2d at 437. Here, there was never any post agreement conduct between the parties that should have led the Plaintiff to believe that she did not need to follow through on the condition that she acquire Defendants' liquor license by the express deadline of June 30, 2003.[1] Consequently, this Court finds that Plaintiff could not unilaterally waive the condition that she acquire a liquor license by June 30, 2003 without materially breaching the parties' agreement.
 Unjust Enrichment
Under Rhode Island law, unjust enrichment is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right. Dellagrotta v.Dellegrotta, No. 2002-46-A., slip op. at 21, (filed May 19, 2005) (citing Toupin v. Laverdiere, 729 A.2d 1286
(R.I. 1999)); Todd Barton, Note and Comment, Filling inthe Gaps in Civil Liability: The Development of UnjustEnrichment in Rhode Island, 9 Roger Williams U.L. Rev. 695, 706-07 (2004). To recover for unjust enrichment, a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances "that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof." Bouchard v. Price, 694 A.2d 670, 673
(R.I. 1997).
In the present case, it is undisputed that during the time Ms. Raab was managing the restaurant she did a significant amount of work on the garage and made improvements to Castle Garden's Café. During the trial, Plaintiff submitted a folder of receipts totaling approximately Eight Thousand Dollars ($8,000) relating to work performed on the garage. With regard to the Castle Garden's Café, Plaintiff submitted receipts totaling another Eight Hundred Dollars ($800) relating to purchases for the bar and kitchen. Additionally, this Court found credible Plaintiff's testimony that she spent Twelve Thousand Dollars ($12,000) on labor costs in making improvements on the garage. It is clear to this Court that due to the improvements made by the Plaintiff, the property has an increased value from which the Defendants will benefit. It is equally clear that at the time Plaintiff made these improvements, she believed, albeit mistakenly, that she was the owner of Castle Garden's Café and the four bay garage based on the purchase and sales agreement. As these were not merely business expenses, but rather improvements that Plaintiff made when she was under the reasonable belief that she was the owner of the property, and since Defendants are now the recipients of improved property, this Court finds that Plaintiff is entitled to recovery for the Twenty Thousand Eight Hundred Dollars ($20,800) she spent on renovations to the property in question.
 Conclusion
For the foregoing reasons, this Court finds that the agreement between the parties in this case is unenforceable and denies Plaintiff's request for specific performance and injunctive relief. Defendants, as the present owners and operators of Castle Garden's Café, can sell and/or list for sale that establishment. However, Plaintiff is entitled to recover the Twenty Thousand Eight Hundred Dollars ($20,800) she spent in making improvements on the property from Defendants.
[1] Defendant offered testimony to the contrary. She believed Plaintiff needed a liquor license to insure a viable business and offering this property for sale with a liquor license increased the value of this property.